UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY KOGER, | ) | |
| | ) | |
| Plaintiff, | ) | 13 C 7150 |
| | ) | |
| vs. | ) | Honorable Judge |
| | ) | Matthew F. Kennelly |
| THOMAS J. DART SHERIFF OF COOK | ) | |
| COUNTY; and COOK COUNTY, ILLINOIS, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COME Defendants, Sheriff Dart and Cook County[1], by their attorney, Anita Alvarez, State's Attorney of Cook County, and through her Assistant, Anthony E. Zecchin, and submit this Memorandum of Law in support of their Federal Rule of Civil Procedure (Fed. R. Civ. P.) 56 Motion for Summary Judgment.

### INTRODUCTION

Plaintiff, Gregory Koger (Plaintiff) filed this lawsuit under 42 U.S.C. 1983, alleging that the failure to have access to a newspaper while he was a pretrial detainee at Cook County Jail (CCJ) violated his First Amendment rights. (Defendants' Local Rule 56.1 Statements of Material Facts, "Def. SOF" ¶1). Plaintiff also seeks declaratory and injunctive relief.

Defendants now move for summary judgment because there is no genuine issue of material fact and as a matter of law the CCJ policy prohibiting newspapers is constitutional under Supreme Court and Seventh Circuit authority. Plaintiff's request for declaratory and injunctive relief cannot survive summary judgment as he is no longer in CCJ and thus he is not entitled to such relief. For these reasons, Defendants are entitled to summary judgment.

---
[1] Cook County is being sued solely for indemnification. See Pl. amended compl., ¶ 8.

**STANDARD OF REVIEW**

Under Rule 56(c), summary judgment is proper "if the pleadings, deposition, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Although the court must view all facts and reasonable inferences in favor of the nonmoving party, *Samuelson v. LaPorte Cnty. Sch. Corp.,* 526 F.3d 1046, 1051 (7th Cir. 2008), those inferences must be both reasonable *and* find support in the record. *See Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010)(emphasis added).

Summary judgment must be entered against the non-moving party where that party "fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A party who bears the burden of proof on a particular issue at trial may not rest on the pleadings, but must affirmatively demonstrate, by specific facts, that there is a genuine issue of material fact that requires trial. *Hannemann v. Southern Door County School Dist.*, 673 F.3d 746, 751 (7th Cir. 2012). Summary judgment should be granted if no reasonable jury could return a verdict for the motion's opponent. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)

**ARGUMENT**

I. **CCJ's Policy of Not Allowing Newspapers Is Reasonably Related to Legitimate Penological Interests in Maintaining Safety and Security**

Plaintiff alleges that among the books and magazines that he received, on one occasion he was denied a newspaper at the Cook County Jail. Although Plaintiff has alleged that the policy of not allowing him to have access to a newspaper was unconstitutional, he has failed to

show that this policy was actually a constitutional violation. Moreover, the policy is based on valid security concerns and thus Defendants are entitled summary judgment in their favor.

The Court's analysis of Plaintiff's claims is governed by the Supreme Court's decisions in *Bell v. Wolfish*, 441 U.S. 520 (1979), and to a greater extent *Turner v. Safely*, 482 U.S. 78 (1987). In order to succeed on his claim, Plaintiff must satisfy a "heavy burden" by proving CCJ's policy prohibiting newspapers was not reasonably related to their legitimate penological interests in maintaining safety and security. *Bell*, 441 U.S. at 538, 561; *see Turner*, 482 U.S. at 89. Based on the record before this Court, Plaintiff has failed to do so and this Court must grant summary judgment in Defendants' favor.

It is well-established that jail officials are entitled to a great deal of deference when addressing the day-to-day operations of correctional institutions. *See, e.g., Turner*, 482 U.S. at 84-85 (courts are "ill equipped" to deal with prison administration and, because that task is "peculiarly within the province of the legislative and executive branches of government . . . [the] separation of powers concerns counsel a policy of judicial restraint"); *Pell v. Procunier*, 417 U.S. 817, 827 (1974)(limitations on in-custody visitation is "peculiarly within the province and professional expertise of corrections officials. . ."); *Rapier v. Harris*, 172 F.3d 999, 1003 (7th Cir. 1999)(courts should defer to the expertise of correctional officials regarding implementation of measures related to pretrial confinement); *see also Lewis v. Tully*, 660 F. Supp. 293, 297 (N.D. Ill. May 14, 1987)(Duff, J.)("the court must be careful not to substitute its own judgments for the reasonable decisions of the Sheriff on matters of prisoner security").

In *Bell*, the Supreme Court held that the Metropolitan Correctional Center's (MCC) mandatory policy of body cavity searches for all detainees after contact visits with outsiders was constitutional. *Bell*, 441 U.S. at 560. The Court reasoned that a "detention facility is a unique

3

place fraught with serious security dangers," *Id.* at 559, the management of which "courts are ill equipped to deal with." *Id*. at 548. As a result and because "problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions…[p]rison administrators...should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547; *see Block v. Rutherford,* 468 U.S. 576, 589 (1984)(courts may not engage in "an impermissible substitution of [our] view on the proper administration of [a correctional facility] for that of the experienced administrators of that facility."); *see also Jones v. N.C. Prisoners' Labor Union, Inc.,* 433 U.S. 119, 128 (1977); *Pell,* 416 U.S. at 404-05. "[I]n the absence of *substantial evidence* in the record to indicate that the officials have *exaggerated* their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* at 547-548 (emphasis added)(citations omitted).

Following *Bell*, the Supreme Court enunciated a more deferential standard for reviewing prison regulations, which centered on "reasonable[ness]." *Turner,* 482 U.S. at 89. At issue in *Turner* was the constitutionality of two regulations of the Missouri Division of Corrections: one restricting inmate-to-inmate mail correspondence and the other requiring the superintendent's permission for inmates to marry. *Id.*

The *Turner* Court held that a prison regulation is valid if it is reasonably related to a legitimate penological interest. *Id.* at 89. The Court established a four-factor test to determine reasonableness: (1) whether there is a rational relationship between the regulation and the legitimate government interest advanced; (2) whether inmates have alternative means of exercising the restricted right; (3) whether and the extent to which accommodation of the asserted right will impact prison staff, inmates' liberty, and the allocation of limited prison

4

resources; and (4) whether the contested regulation is an "exaggerated response" to prison concerns and if there is a "ready alternative" that would accommodate inmates' rights. *Id.* at 89-91. Once again, the Court recognized that prison security is a "core function[] of prison administration" and judgments "regarding prison security 'are peculiarly within the province and professional expertise of corrections officials.'" *Id.* at 86, 92 (citations omitted); *see Bell,* 441 U.S. at 547.

The Seventh Circuit recently applied the *Turner* standard in *Singer*. That case involved an inmate who brought a claim against various prison officials alleging that the prison's confiscation of his Dungeons and Dragons [2] (D&D) material and the prison's imposition of a ban on D&D game play violated his constitutional rights. *Id.* at 531. In applying the *Turner* test, the appellate court began by finding that -- while all four factors are important -- "the first one can act as a threshold factor regardless of which way it cuts." *Id.* at 534. The court emphasized that inmates "challeng[ing] the reasonableness of a prison regulation bear the burden of proving its invalidity." *Singer,* 593 F.3d at 534. The court found the burden to be a "weighty one" where they "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Id.*

When a detainee claims that a jail's policy is unconstitutional, his "burden is not significantly lightened by the procedural strictures of summary judgment, which require [the court] to draw 'all justifiable inferences' in his favor, *Singer*, 593 F.3d at 534 (citing *Anderson*, 447 U.S. at 255), because [the court] must distinguish between inferences relating to disputed facts and those relating to disputed matters of professional judgment." *Id.* (citing *Beard v. Banks*,

---

[2] D&D is a "fantasy role-playing game in which players collectively develop a story around characters whose personae they adopt." *Singer*, 593 F.3d at 532.

5

548 U.S. 521, 530 (2006)). Instead, the court's "inferences to disputed matters of professional judgment are governed by *Overton*, which mandates deference to the views of prison authorities." *Id.* (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)). "Unless [the detainee] can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Id.* (citing *Beard*, 548 U.S. at 530).

Singer argued there was no "existence of a rational relationship" between prison security and their policy banning D&D. *Id.* at 536. In support of his claim, Singer provided fifteen affidavits from inmates and experts stating that not only does D&D serve as a rehabilitative tool, but also that D&D had not incited violence or motivated participants to engage in gang-like activities. *Id.* at 537. In response, the prison officials provided a single affidavit from the prison's "security supervisor" stating that fantasy role-playing games *could* endanger the "safety and security of the institution" and inmate's rehabilitation by promoting "competitive hostility, violence, and addictive escape behavior."[3] *Id.*

The appellate court rejected Singer's argument in its entirety. In applying the first *Turner* factor, the court held that once the prison officials provided a "plausible explanation" that D&D *could* undermine prison security, the burden shifted to Singer to present evidence that the prison official's explanation was "so remote as to render the policy arbitrary or irrational." *Id.* at 536 (citations omitted). The court found that despite the plaintiff offering many affidavits in support of his claim, the affiants lacked "expertise" relating to "prisons, their security, and the prevention of prison gang activity…to raise a genuine issue of material fact" as to whether the prison's policy was reasonably related to a legitimate penological interest. *Id.* at 536.

---

3 Prison officials did not present any evidence that D&D actually led to inmate violence, gang activity, or "addictive escape behavior." *Id.* at 536.

In the instant case, Plaintiff has failed to establish that the policy at issue was unconstitutional under the *Turner* analysis. The first factor requires a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it. [internal citation omitted] Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is *so remote* as to render the policy *arbitrary or irrational*." *Turner,* 482 U.S. at 89-90 (emphasis added). Prison officials in *Turner* testified that correspondence between inmates at other prisons *could* have been used to communicate escape plans, arrange violent acts, or threaten the safety of inmates in protective custody. *Id.* at 91. The Court found that -- despite there being no evidence that prisoners used correspondence to breach security -- the prison official's policy of restricting correspondence between inmates was "logically connected to these legitimate security concerns." *Id*. In this case, multiple reasons have been proffered by Defendants that establish the "valid, rational connection" between the prohibition of newspapers and the legitimate governmental interest in maintaining order and security at CCJ. *See Turner*, 482 U.S. at 89. The Sheriff's Fed. R. Civ. P. 30(b)(6) witness testified to the multiple bases for not permitting detainees to receive newspapers at CCJ: the potential for its use to start fires, sanitation issues (e.g., accumulation of daily newspapers), inmate violence, plumbing issues, the possibility of its use to create weapons, and the difficulties posed by searching them coming in through the mail. (Def. SOF ¶14). These concerns require the conclusion that the CCJ policy addresses many legitimate penological interests.

The security concern about fires in CCJ is significant. Over the past two years, there have been approximately thirty documented fires set by detainees at CCJ. (Def. SOF ¶16). This danger is obvious and banning newspapers reduces what would be a major source of materials that could

be used for fires. In fact, the reduction of combustible materials in CCJ is one of the provisions covered by the Agreed Order in *United States v. Cook County*, 10 C 2946. (Def. SOF ¶17). Moreover, the lack of incidents involving newspapers does not undermine the justification for CCJ's policy, but instead demonstrates the policy's successful deterrent effect. *Bell,* 441 U.S. at 559; *see Florence v. Board of Chosen Freeholders*, 621 F.3d 296, 309 (3rd Cir. 2010); *see also Bull v. City of San Francisco*, 595 F.3d 964, 975 (9th Cir. 2010).

The sanitation issues attendant with providing daily newspapers to detainees also support CCJ's policy. Detainees are allowed to keep personal property as long as it fits within the property box that is provided to each detainee. (Def. SOF ¶5,12). Unlike magazines and books, newspapers are more disposable and have less "shelf-life." Thus, it makes sense that when forced to choose among the different sources of paper, they would remain banned in the face of the need to reduce combustible material, while books and magazines would be allowed. With newspapers flooding in daily, either detainees would quickly use up the space available in their property box or they would have to discard the newspapers as necessary, leading to a significant increase in the amount of trash that would either need to be disposed of or clutter up the detainee's cell, causing unsanitary and unsafe conditions. The additional newspapers would also provide more places that detainees could hide contraband.

The potential for increased inmate-on-inmate violence also provides a valid basis for the newspaper prohibition policy. (Def. SOF ¶20). The contents of newspaper articles, which may include detailed information about crimes that have been committed, such as home addresses and names of victims and witnesses, would pose very serious safety concerns for those individuals and compromise ongoing criminal investigations or prosecutions. Moreover, the details of certain crimes, especially if the victim is of a special class (e.g., children or the elderly) or the

incident was gang-related, may cause other detainees to impose their own form of justice on those detainees charged with such offenses. (Def. SOF ¶20). Newspapers can also be used at CCJ as a surreptitious means to send narcotics to detainees. Narcotics or cannabis-based derivatives are sprayed or spread on paper that is sent to inmates at CCJ for consumption, (Def. SOF ¶21), which make its detection virtually impossible to the naked eye. These concerns are valid and connected to the security of CCJ; therefore, the policy is appropriate and constitutional.

Plaintiff may argue that all types of paper poses the same risks that CCJ ascribes to newspapers. Indeed, that may be the case. However, newspapers are unique in that they would be responsible for producing a far greater daily volume of paper than the books and magazines that are permitted to be sent to inmates. Increased volume of paper means increase in combustible material. The increased volume of paper increases the amount that must be searched upon intake into the Jail, and would impair the ability to conduct searches to keep contraband from the Jail. (Def. SOF ¶22).

The second factor of the *Turner* analysis also demonstrates the constitutionality of CCJ's newspaper policy. This factor looks to whether "alternative means of exercising the right remain open" to the inmates. *Id.* at 90. "Where 'other avenues' remain available for the exercise of the asserted right [internal citation omitted], courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials…in gauging the validity of the regulation." *Id.* (citing *Pell,* 417 U.S. at 827). The *Turner* Court held that the prison's policy did not bar prisoners of all communication – just with inmates at other prisons within the Missouri prison system – and thus the prison's policy was reasonably related to legitimate security concerns. *Id.* at 92. There is little doubt that "alternative means of exercising the right remain[s] open" to the detainees" in the instant case. *See Id.* at 90. Detainees are free to read and keep books, magazines

9

and other periodicals, subject to number and space limitations. (Def. SOF ¶6,12). In addition, detainees are allowed to watch television, receive visitors and correspond with those outside of CCJ. (Def. SOF ¶6). All of these options provide CCJ detainees with alternative means of receiving information related to current events. There is nothing about the prohibition of newspapers – and only newspapers – that is not cured by the access detainees have to other sources of information while at CCJ. Here, with ready access to alternative means of receiving current information, there is no question that the CCJ policy is constitutional.[4]

The third factor looks at the "impact of [the inmate's] asserted right on other inmates and prison personnel." *Id.* at 92. In *Turner*, prison officials reiterated that correspondence between inmates at other prisons would "threaten the core functions of prison administration, maintaining safety and internal security." *Id.* The Court concluded that the policy limiting such correspondence was appropriate because it required judgment "peculiarly within [the officials'] province and professional expertise' [internal citation omitted]. *Id.* at 92-93.

The accommodation of Plaintiff's asserted right would dramatically impact the work of CCJ staff in administering the mail system at CCJ and does not outweigh the significant burden which would be imposed on CCJ staff if the relief he seeks is granted. The mailroom at CCJ receives over a thousand of pieces of mail per day. (Def. SOF ¶23). In order to process this volume of incoming mail, at least twelve CCJ staff members are required to screen and sort everything sent to the detainees. (Def. SOF ¶23). This search procedure is not some quick scan; each page or parcel is checked not only for contraband, but also for any sensitive information that may also cause security and safety concerns (e.g. names of victims, nature of the crime) before that piece of mail, book or parcel is cleared to be given to the detainee. (Def. SOF ¶24).

---

4 It is also worth noting that although Plaintiff's complaint alleges an unconstitutional policy, his own testimony establishes on only one occasion he did not receive a copy of the Chicago Tribune. (Def. SOF ¶1).

The concern of contraband being sent via incoming mail is very real and poses a significant threat to security at CCJ. A preliminary search of incoming mail is done by drug-sniffing dogs in an effort to detect any narcotics hidden within the incoming mail. (Def. SOF ¶24). In the last month alone, eleven letters or parcels had eluded the dog sniff search and were discovered to have contained narcotics. (Def. SOF ¶24). That is independent of any other contraband that may be hidden within mail or parcels that the dogs could not detect. The magnitude of the burden on CCJ staff that would be imposed if daily newspapers were allowed is easily borne out by the numbers. For example, if the average newspaper contained 60 pages and 500 detainees sought to receive a *single* newspaper each day, an additional twelve staff members – double the current number – would be required to perform the necessary search of the additional 30,000 pages *per day* that would become part of stream of incoming mail.[5] Given the significant burden on CCJ staff that would be created by allowing daily newspapers into CCJ, it is clear that this factor supports CCJ's policy. Not only is the burden going to be on the staff that is responsible for screening the mail, but also the staff that must dispose of the newspapers and respond to any plumbing issues that may arise from improper disposal by detainees.

     The final *Turner* factor also demonstrates that the CCJ policy is reasonable. The record fails to show that the newspaper prohibition is an "exaggerated response" to the very real security concerns of CCJ staff. This factor looks at whether there were "obvious [and] easy alternatives to the policy adopted" by the prison officials. *Id.* at 90. The Court found that the existence of "obvious" and "easy" alternatives *may* be evidence that the regulation is "not reasonable" and an "exaggerated response" to prison concerns. *Id.* (emphasis added). However, the Court emphasized that "this is not a 'least restrictive alternative' test: prison officials do not

---

5 This example reflects just 5% of the average daily Jail population, obviously does not take into account if more detainees were receiving newspapers or if detainees were receiving multiple newspapers per day.

have to attempt every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an inmate claimant can point to an alternative that fully accommodates a prisoner's rights at *de minimis* cost to valid penological interests," the court may "consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91. In *Turner*, the Court found that implementing the inmate's alternatives -- monitoring all inmate correspondence -- would hardly be *de minimis* and would result in an "appreciable risk" of missing dangerous messages and a significant burden on correctional staff to "conduct item-by-item censorship." *Id.* at 93. Again, Plaintiff's complaint concerns only the unavailability of newspapers at CCJ. This limitation is minor at best, and Plaintiff has failed to produce any evidence to demonstrate that the policy is an "exaggerated" response to security concerns. Indeed, Plaintiff has failed to provide evidence to demonstrate an alternative policy that would present only *de minimis* cost and not affect CCJ's valid penological interests.

There is simply no evidence in the record to show that the CCJ policy is unconstitutional under the test set forth in *Turner*. Defendants have presented sufficient evidence to demonstrate that the policy at issue was "logically connected" to legitimate security concerns, which need not be actual, but also potential. *Turner*, 482 U.S. at 91 (finding that restricting inmate correspondence which *could have been* used to breach security was sufficient to permit such restrictions, even without evidence of an actual breach).

Plaintiff has failed to produce anything other than his own deposition testimony to support his claim. Indeed, by Plaintiff's own admission, he offers no opinion on any jail security implications. (Def. SOF ¶9). Plaintiff has put forth no affidavits, expert testimony or other evidence to support his argument that the policy at issue is unconstitutional; therefore, he cannot defeat summary judgment. *See Singer*, 593 F.3d at 537 (rejecting the plaintiff's proffered

evidence, including numerous affidavits, as it failed to dispute the security-related reasons for prohibiting the game that were asserted by the prison officials).

## II. Plaintiff Lacks Standing to Seek Either an Injunction or a Declaratory Judgment, and Neither is an Available Remedy.

Plaintiff cannot seek a declaratory judgment or an injunction as a remedy for his alleged injury because he lacks standing to do so. Standing is grounded in Article III of the U.S. Constitution, and addresses whether or not there is an actual case or controversy for the courts to resolve. *Lehn v. Holmes*, 364 F.3d 862, 870 (7th Cir. 2004). To establish Article III standing, a plaintiff must show 1) he has suffered an injury in fact that is a) concrete and particularized, and b) actual and imminent, not conjectural or hypothetical; 2) the injury is fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* (citing *Friends of the Earth, Inc., v Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 180-81 (2000)). Plaintiff has failed to do so here.

While standing to seek damages for an alleged past wrong is not in dispute in this case, standing to seek injunctive or declaratory relief requires something more, something that Plaintiff cannot establish. A § 1983 plaintiff is entitled to injunctive and declaratory relief only if he has a personal stake in the outcome of the litigation, and to do that a plaintiff must show that he has sustained or is in immediate danger of sustaining direct injury as a result of the challenged official conduct. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02, 111-12 (1983). Evidence of past wrongs is insufficient to merit equitable relief. *Id.*; *see also Perry v. Sheahan*, 222 F. 3d 309, 313 (7th Cir. 2000)(stating "past exposure to illegal conduct does not itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects").

The Seventh Circuit and sister courts in this district have repeatedly found that once an incarcerated individual is released from or transferred out of the specific correctional institution where an alleged injury took place, injunctive relief is no longer available as a remedy for that plaintiff. *See, e.g., Lehn*, 364 F.3d at 871 (recognizing "the uncontroversial proposition that when a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief, and hence the prisoner's claim, become moot"); *Henderson v. Sheahan*, 196 F.3d 839, 843 n.1 (7th Cir. 1999)(noting that plaintiff's "subsequent transfer to a state prison facility mooted his claims for declaratory and injunctive relief" based on claims related to his exposure to secondhand smoke while housed at CCJ); *Stewart v. McGinnis*, 5 F.3d 1031, 1037-39 (7th Cir. 1993)(prisoner who had been transferred to another prison no longer had standing to seek declaratory or injunctive relief for alleged due process violations); *Arreola v. Choudry*, 03-cv-2854, 2007 U.S. Dist. LEXIS 8701, at * 10-14 (N.D. Ill. Jan. 30, 2007)(Kennelly, J.)(granting summary judgment for defendants on plaintiff's claim for injunctive relief against CCJ because plaintiff was no longer incarcerated at CCJ, there was no basis other than speculation that plaintiff would be returned to CCJ, the potential class the plaintiff was seeking to represent had not yet been certified, and plaintiff therefore lacked standing for injunctive relief).[6]

---

6 *See also, e.g., Knox v. McGinnis*, 998 F.2d 1405, 1413-25 (7th Cir. 1993)(prisoner released from administrative segregation lacked standing to seek injunction barring prison officials from violating his eighth amendment rights); *Young v. Lane*, 922 F.2d 370, 373 (7th Cir. 1991)(rejecting as moot plaintiffs' request for declaratory and injunctive relief related to alleged infringement of their first amendment right because they were not longer in Dixon Correctional Center); *Dickey v. Harrington*, 14-cv-1024 2014 U.S. Dist. LEXIS, 147414, at *19 (S.D. Ill. Oct 16, 2014)(rejecting plaintiff's request for injunctive relief as moot because he was no longer incarcerated at the location where the alleged violations of his civil rights took place); *Shatner v. Atchison*, 13-cv-599, 2013 U.S. Dist LEXIS, 99520, at *8-9 (S.D. Ill. July 17, 2013)(stating that "[w]hen prison inmates challenge prison practices, their equitable claims are moot once they move to another prison that does not apply those practices"); *Hildreth v. Cook County*, 08-cv-3506, 2010 U.S. Dist. LEXIS 39983, at * 6 (N.D. Ill. Apr. 23, 2010)(claim for injunctive relief is moot because plaintiff is no longer incarcerated at CCDOC); *Jenkins v. Velasco*, 94-cv-7391, 1995 U.S. Dist. LEXIS 19258, at *10 (N.D. Ill. 1995)(plaintiff's claim for "injunctive relief is moot because he is no longer incarcerated at the Cook County Jail and does not allege that he is likely to return there").

Plaintiff's Amended Complaint concerns a policy that allegedly caused him constitutional injury while he was a detainee at CCJ. Dkt. no. 20. However, Plaintiff is no longer incarcerated at CCJ, (Def. SOF ¶1,10), and thus it is clear he is not entitled to such relief. Moreover, Plaintiff has as much as conceded that he is not entitled to equitable relief when he admitted "Plaintiff cannot credibly allege that he faces a realistic threat of being subject in the future to the Sheriff's no-newspaper policy, since it would demand his being arrested and placed in Cook County Jail again." Plaintiff's Mot. Leave to File Am. Compl., Dkt. no. 17, ¶ 4. Plaintiff has not brought this case as a class action, and it is reasonable to assume some CCJ inmates such as sexual predators or those with high profile cases may prefer not to have newspapers with details about their cases readily available in CCJ, and may have interests that do not align with Plaintiff. *Id.*

Seventh Circuit precedent establishes that Plaintiff's claims for declaratory and injunctive relief cannot be allowed to proceed. Plaintiff has failed to demonstrate that his entitled to such relief and Defendants are entitled to judgment as a matter of law.

## CONCLUSION

WHEREFORE Defendants, for all of the foregoing reasons, respectfully request that this Honorable Court grant Defendants' summary judgment along with fees and costs, and further, that this Court dismiss Plaintiff's Complaint for failing to state a claim on which relief may be granted and/or as frivolous pursuant to § 1915(e)(2)(B)(i)(ii).

Respectfully submitted,

ANITA ALVAREZ
State's Attorney of Cook County
/s/ Anthony E. Zecchin
Assistant State's Attorney
500 Richard J. Daley Center
Chicago, IL 60602
(312) 603-3373