# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| GREGORY KOGER, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 13 C 7150 |
| THOMAS J. DART, Sheriff of Cook County; and COOK COUNTY, ILLINOIS, | ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Gregory Koger has sued Cook County and its Sheriff Thomas Dart under 42 U.S.C. § 1983. Koger alleges that the Cook County Jail's absolute ban on newspapers is unconstitutional under the First Amendment, and he requests an injunction, declaratory relief, and nominal damages. Both sides have moved for summary judgment. For the reasons stated below, the Court concludes that Koger's request for an injunction is moot and therefore grants defendants' motion for summary judgment as to that relief. The Court concludes that the jail's newspaper ban is unconstitutional and therefore grants Koger's motion for summary judgment on his First Amendment claim and awards a declaratory judgment and nominal damages.

### Background

Gregory Koger is a member of a group called the Ethical Humanist Society. In 2009, he was arrested while videotaping the remarks of a speaker who had cancelled a meeting with the group. Koger was sentenced to 300 days in jail for misdemeanor

criminal trespass, simple battery, and resisting arrest.  A committee of supporters provided Koger with a legal defense and other assistance during his incarceration.

Between July and October 2013, Koger served the last portion of his sentence in the Cook County Jail.  While there, Barbara Lyons, one of Koger's supporters, sent him letters, books, magazines, an issue of *Revolution Newspaper*, and an issue of the *Chicago Tribune*.  Although Koger received the books, letters, magazines, and even *Revolution Newspaper*, the jail returned the *Chicago Tribune* to Lyons with a form marked "no newspapers."

The issue of the *Chicago Tribune* was refused pursuant to the jail's absolute ban on newspapers, which has been in place since 1984.  The no-newspaper policy applies regardless of content; newspapers with local news, national news, international news, political commentary, and entertainment news are all banned.  The policy also applies regardless of origin; that is, it applies even if the newspaper is sent directly from the publisher.  It applies to entire newspapers and newspaper clippings.  And it applies throughout the jail.

Although inmates may not possess newspapers, they are permitted to possess paper bags, notepaper, drawing pads, books, magazines (including magazines made from the same material as newspapers), envelopes, legal materials, greeting cards, playing cards, religious texts, letters and photos sent from outside the jail, toilet paper, extra undergarments, and bedding.  These possessions, however, must fit into a property box that measures 21" long, 8.5" deep, and 15.5" wide.  Thus, the jail imposes a strict limit on how much property an inmate may possess at any given time.

In August 2013, Koger filed a grievance demanding that the jail rescind its

newspaper policy. The grievance went unanswered. Koger filed suit against Cook County and Sheriff Thomas Dart on October 4, 2013, twenty days before he was released from jail. He alleges that the jail's newspaper policy violates the First Amendment and requests an injunction, declaratory relief, and nominal damages

## Discussion

The parties have cross-moved for summary judgment on Koger's First Amendment claim, which is his only claim. On cross-motions for summary judgment, the court assesses whether each movant has satisfied the requirements of Rule 56. *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). A party is entitled to summary judgment if it shows that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 248; *Srail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009).

**A.   Mootness**

Defendants contend that Koger's request for injunctive relief is moot. Article III of the Constitution restricts federal court jurisdiction to "live cases and controversies." *Goldman v. Gagnard*, 757 F.3d 575, 581 (7th Cir. 2014); U.S. Const. art. III, § 2. "A case is moot, and thus falls outside of the judicial power conferred in Article III, if the outcome will no longer settle an active dispute about the parties' rights." *Goldman*, 757 F.3d at 581. "The requirement that a case have an actual, ongoing controversy extends

3

throughout the pendency of the action." *Stotts v. Cmty. Unit Sch. Dist. No. 1*, 230 F.3d 989, 990 (7th Cir. 2000).

Koger's request for injunctive relief is indeed moot. Koger filed suit while he was still incarcerated at the jail, and he had Article III standing to seek injunctive relief at that time. Shortly thereafter, however, he was released. Because Koger is no longer incarcerated at the jail, and there is no evidence that he will suffer injury from the jail's newspaper policy in the future, his request for injunctive relief is now moot. *See Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004) ("[W]hen a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief, and hence the prisoner's claim, become moot."); *Henderson v. Sheahan*, 196 F.3d 839, 843 n.1 (7th Cir. 1999); *Young v. Lane*, 922 F.2d 370, 373 (7th Cir. 1991) ("The plaintiffs . . . , by virtue of their transfers, are no longer incarcerated at [the prison]. Unaccompanied by any continuing, present injury or real and immediate threat of repeated injury, their past exposure to illegal conduct at [the prison] does not show a pending case or controversy regarding injunctive relief . . . and we must vacate as moot that portion of their prayer for relief.").

Koger argues that overbreadth doctrine provides an exception to the Article III case-or-controversy requirement as it applies in this case, thus rescuing his claim for injunctive relief. But Koger conflates the Article III case-or-controversy requirement and the "[t]he presumption against third-party standing," a prudential standing requirement. *Marin-Garcia v. Holder*, 647 F.3d 666, 670 (7th Cir. 2011).

The presumption against third-party standing holds that "even though a person may suffer an injury that satisfies the constitutional case or controversy requirement of

Article III . . . he generally may not redress his injury by reference to someone else's rights." *Id.* It thus "recognizes that claims are best prosecuted by those who actually have been injured, rather than by someone in their stead." *Id.* The overbreadth doctrine, however, "permits litigants already before the court to challenge a regulation on its face and raise the rights of third parties" in order to "avoid chilling the speech of third parties who may be unwilling or unlikely to raise a challenge in their own stead . . . ." *Schultz v. City of Cumberland*, 228 F.3d 831, 848 (7th Cir. 2000). Thus, "in the area of First Amendment litigation, the federal courts have relaxed their prudential concern with regard to third-party standing because of the challenged law or regulation's potential chilling effect on protected expression." *Shimer v. Washington*, 100 F.3d 506, 508 (7th Cir. 1996). This is permissible because third-party standing is "rooted in prudence, rather than the Constitution . . . ." *Id.* at 509.

Even when the overbreadth doctrine applies, however, the plaintiff must satisfy Article III. *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984) (holding that overbreadth doctrine applied, and thus "[t]he crucial issues are whether [the plaintiff] satisfies the requirement of 'injury-in-fact,' and whether it can be expected to satisfactorily frame the issues in the case"); *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 754 (5th Cir. 2010) ("Article III standing retains rigor even in an overbreadth claim."); *Clark v. City of Lakewood*, 259 F.3d 996, 1010-11 (9th Cir. 2001) ("[The plaintiff] still must meet the requirements for overbreadth standing: injury in fact and ability satisfactorily to frame the issues in the case."); *Bordell v. Gen. Elec. Co.*, 922 F.2d 1057, 1061 (2d Cir. 1991) (overbreadth doctrine is a "slender exception to the prudential limits on standing" and "does not affect the rigid constitutional requirement

5

that plaintiffs must demonstrate an injury in fact to invoke a federal court's jurisdiction"). An overbreadth challenge is therefore no cure for mootness, an Article III defect. *See Goldman*, 757 F.3d at 581.

Although Koger's request for injunctive relief is moot, he may still pursue nominal damages, as well as his request for a declaratory judgment as a predicate to an award of nominal damages. *See Nelson v. Miller*, 570 F.3d 868, 883 (7th Cir. 2009) ("When a claim for injunctive relief is barred but a claim of damages remains, a declaratory judgment as a predicate to a damages award can survive."). The Court notes that defendants do not argue that Koger lacks standing to pursue his claim for nominal damages.

**B.     First Amendment claim**

The Court turns next to the merits of Koger's First Amendment claim. Koger contends that the jail's newspaper policy violated his constitutional right to freedom of speech. The jail defines newspapers as contraband. All newspapers are prohibited, regardless of origin or content. While Koger was incarcerated at the jail, he was sent an issue of the *Chicago Tribune*, which the jail refused pursuant to this policy. A governmental entity "may be found liable under § 1983 when it violates constitutional rights via . . . the enforcement of an express policy . . . ." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010).

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). Constitutional rights inside a prison or jail, however, are not identical to those outside; "the Constitution sometimes permits greater restriction of such rights in a prison than it would allow

6

elsewhere."  *Beard v. Banks*, 548 U.S. 521, 528 (2006).  Courts acknowledge that running a prison "is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government."  *Turner*, 482 at 84-85.  Courts must therefore "accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."  *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).[1]

Balancing these two considerations, the Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  *Turner*, 482 U.S. at 89.  To determine reasonableness, the Court must consider four factors:  whether the regulation is rationally connected to a legitimate and neutral government objective; whether alternative means of exercising the right remain open to the inmate; what impact accommodation of the asserted right will have on guards and other inmates; and whether there are obvious alternatives to the regulation that show that it is an exaggerated response to prison concerns.  *Lindell v. Frank*, 377 F.3d 655, 657 (7th Cir. 2004) (citing *Turner*, 482 U.S. at 89-91).  "The burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."  *Overton*, 539 U.S. at 132.

---

[1] At summary judgment, this means that the Court "must distinguish between inferences relating to disputed facts and those relating to disputed matters of professional judgment."  *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010).  Thus, the Court draws reasonable factual inferences in the non-movant's favor but defers to prison administrators on matters of professional judgment.

"Freedom of speech is not merely freedom to speak; it is also freedom to read." *King v. Fed. Bureau of Prisons*, 415 F.3d 634, 638 (7th Cir. 2005). Although the Supreme Court has yet to decide a case involving an absolute ban on newspapers in prison, the Court addressed a more limited ban in *Beard*. In *Beard*, the prison banned newspapers in the prison's "special unit[] . . . maintain[ed] for difficult prisoners." *Beard*, 548 U.S. at 525. The purpose of the ban was to motivate these inmates to improve their behavior. *Id.* at 530-31. If an inmate's behavior improved, he could "graduate to the less restrictive level" of the special unit, where he would "enjoy . . . the right to receive one newspaper and five magazines." *Id.* at 526. The plurality held that this restriction was reasonably related to improving inmate behavior. *Id.* at 530. It also acknowledged, however, that "the constitutional interest here is an important one" and the prison's "restriction is severe . . . ." *Id.* at 535. Thus, the plurality suggested in dicta, "if faced with evidence that [it were] a *de facto* permanent ban"—that is, evidence showing that inmates rarely graduated to the less restrictive level—"we might reach a different conclusion . . . ." *Id.* That suggests that the Supreme Court may be poised to strike down an absolute ban on newspapers in prisons. If the Court were prepared to find unconstitutional a *de facto* permanent ban limited to difficult inmates, then a permanent ban applicable to all inmates necessarily would fall.

The Seventh Circuit has previously declared unconstitutional a jail policy that banned newspapers. In *Kincaid v. Rusk*, 670 F.2d 737 (7th Cir. 1982), the jail "barred access by pretrial detainees to reading material other than softbound (paperback) books and [non-pictorial] magazines." *Id.* at 740. The Seventh Circuit held that "[m]aintenance of security and discipline do not justify the wholesale prohibition of

8

pictorial magazines, hardbound books or newspapers." *Id.* at 744. But *Kincaid* does not control the present case, for three reasons. First, the ban at issue in *Kincaid* was broader than the ban here, encompassing not just newspapers but also pictorial magazines and hardbound books. Second, *Kincaid* addressed a smaller set of security risks (fires and sanitation) than those advanced by defendants to justify the Cook County Jail's newspaper ban. Third, and most important, *Kincaid* predated *Turner*, where the Supreme Court articulated the factors for determining whether a prison regulation is reasonably related to a legitimate penological interest.

More recently, in a post-*Turner* case, the Seventh Circuit considered a "publishers only" rule that banned "clippings of published articles, or photocopies of such clippings." *Lindell*, 377 F.3d at 658. Applying the *Turner* factors, the court held that the ban on newspaper clippings was unconstitutional. *Id.* at 660. A finding that the absolute ban on newspapers at issue in the present case violates the First Amendment would seem to follow from *Lindell*'s holding that a ban confined to newspaper clippings is unconstitutional—a conclusion that is supported by the Seventh Circuit's earlier decision in *Kincaid*, as well as out-of-circuit precedent. *See, e.g.*, *Thomas v. Leslie*, 176 F.3d 489, at *7 (10th Cir. 1999) (table) ("[T]he absolute ban on newspapers does not constitute a valid, rational connection between the prison regulation and the legitimate governmental interest put forth to justify it . . . ." (internal quotation marks omitted)); *Mann v. Smith*, 796 F.2d 79, 82 (5th Cir. 1986).

Although the case law points towards unconstitutionality, defendants argue that their newspaper ban addresses jail concerns that distinguish this case from *Lindell* and these out-of-circuit cases. The Court must therefore scrutinize the evidence in the

9

record to determine whether the ban can be justified. The factors set forth in *Turner* provide the framework for this analysis.

The first *Turner* factor involves whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (internal quotation marks omitted). The Court must also "inquire [into] whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression." *Id.* at 90. "Neutral" in this context simply means that "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989).

Defendants assert the following rationales for the ban on newspapers: (1) newspapers are flammable, (2) they can cause sanitation problems (inmates can use them to clog toilets, and they are issued with greater frequency than other publications, thus increasing the volume of material that must be disposed), (3) newspapers can be fashioned into weapons using paper mâché, and (4) they can cause violence (inmates may learn about the nature of other inmates' charges or about outside gang activity). Defendants argue that all of these rationales are tied to maintaining jail security, "perhaps the most legitimate of penological goals." *Overton*, 539 U.S. at 133. All four of these rationales are rationally connected to jail security. Although Koger contends that the newspaper ban is underinclusive because the jail permits other material that can cause these problems, he does not dispute that newspapers can be used for these purposes.

Having concluded that the newspaper policy is rationally connected to

maintaining jail security, the Court must assess "whether the . . . policy is a reasonable solution to the stated security problem . . . ." *Lindell*, 377 F.3d at 659. This question is assessed by means of the remaining *Turner* factors. *Id.*

The second *Turner* factor is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. The lack of alternative means for exercising the right is evidence that the regulation is unreasonable. *Overton*, 539 U.S. at 135. It is undisputed that the jail categorically bans newspapers. This factor thus weighs in favor of Koger.

Defendants note that Koger was permitted to read books and magazines, receive visitors and letters, and make telephone calls. They argue that these are adequate alternatives for jail inmates. But courts have not framed the right at this level of generality—that is, simply as a right to read, or as a right to receive news. In *Beard*, for instance, though the inmate was denied access to newspapers and magazines, he was "permitted legal and *personal correspondence*, religious and legal materials, *two library books*, and writing paper." *Beard*, 548 U.S. at 526 (emphasis added). Even though the inmate was permitted to read books and engage in correspondence, the Supreme Court found that "*no* alternative means of exercising the right remain[ed] open to him." *Id.* at 532 (internal quotation marks omitted). Similarly, in *Lindell*, the Seventh Circuit concluded that a newspaper subscription is not an alternative to newspaper clippings "because subscribing requires inmates to anticipate which papers might have articles that they like to read and to subscribe to all such papers." *Lindell*, 377 F.3d at 659. That suggests that the right at issue is not simply a general right to read or find out about the news. Other courts have similarly characterized the right as a right to read

11

newspapers, not a right to read or a right to receive news.  *See Thomas*, 176 F.3d at *5, 8 (concluding that the jail did not provide adequate alternatives to newspapers even though inmates had access to paperback books and television).

Defendants point to *Thornburgh v. Abbott*, 490 U.S. 401 (1989).  There, the Supreme Court stated that in evaluating the second *Turner* factor, "'the right' in question must be viewed sensibly and expansively."  *Id.* at 417.  But the Court did not have occasion to consider the sort of restriction at issue here, as the policy in *Thornburgh* did not restrict an entire category of publications.  Rather, that policy provided that a publication could be rejected "only if it is determined detrimental to the security, good order, or discipline of the institution," prohibited the prison "from establishing an excluded list of publications," and required that "each issue of a subscription publication . . . be reviewed separately."  *Id.* at 404-05.  Because the policy permitted a "broad range of publications to be sent, received, and read," the Court concluded that inmates had alternative means of exercising their First Amendment rights.  *Id.* at 418.  Thus, given the policy at issue in *Thornburgh*—which permitted all categories of reading material, even if certain items were restricted on a case-by-case basis—the Court's comment that the right should be viewed "sensibly and expansively" cannot be read to equate newspapers with books and magazines for purposes of the present analysis.  Indeed, the Court indicated that although "[t]he exercise of discretion called for by [the] regulations may produce seeming 'inconsistencies' . . . [a]ny attempt to achieve greater consistency by broader exclusions might itself run afoul of the second *Turner* factor . . . ."  *Id.* at 417 n.15.

Defendants also contend that television is an alternative to newspapers that the

jail does not restrict. But "[t]elevision cannot supply the depth and diversity of coverage that newspapers can provide." *Thomas*, 176 F.3d at *8; *see also Mann v. Smith*, 796 F.2d 79, 83 (5th Cir. 1986) ("Whatever the intrinsic merits of television in comparison with newspapers and magazines, the contents of television are different from what one finds in the printed media. It is not up to the Midland County Sheriff or this court to decide that television can adequately serve the first amendment right to receive protected materials."). It is undisputed, furthermore, that "[w]hat inmates watch on television is subject to consensus among the prisoners about what to watch, or alternatively, left to the discretion of corrections officers." Defs.' Resp. to Pl.'s LR 56.1(a), ¶ 27. This likewise weighs against the availability of television as saving the jail's newspaper ban. *See Thomas*, 176 F.3d at *8.

The third and fourth *Turner* factors are often intertwined. The third *Turner* factor is "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. Assessment of this factor can depend on how the right is accommodated, which goes to the fourth *Turner* factor: "[T]he existence of obvious, easy alternatives" that suggest that the regulation "is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* Although "[t]his is not a 'least restrictive alternative' test," if Koger "can point to an alternative that fully accommodates [his] rights at *de minimis* cost to valid penological interests," the Court "may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 90-91.

It is undisputed that the jail permits inmates to possess paper bags, notepaper, drawing pads, books, magazines (including magazines made from the same material as

newspapers), envelopes, legal materials, greeting cards, playing cards, religious texts, letters and photos sent from outside the jail, toilet paper, extra undergarments, and bedding. All of this material can, like newspapers, be used to start fires, clog toilets, or make weapons. Defendants contend that newspapers are uniquely flammable. But aside from an isolated, conclusory statement in the deposition of defendant's Rule 30(b)(6) designee, there is not a speck of evidence to support this contention (indeed, it is undisputed that defendants did not consider empirical evidence about the flammability of newspapers in fashioning the policy). *See* Pl.'s LR 56.1(a) Stmt., Ex. 2 (Kurtovich Dep.), at 32:8-11 (stating that in his "personal opinion" newspapers are more flammable than other kinds of paper, but admitting "I'm not a fire expert"). Moreover, because the jail already limits inmate possessions to a property box, allowing newspapers would not increase the amount of such material in circulation. On this record, no reasonable fact finder could find that lifting the ban on newspapers would have more than a *de minimis* impact on the number of fires, clogged toilets, or paper mâché weapons in the jail. As to these three rationales, then, the third *Turner* factor weighs in favor of Koger.

The impact of lifting the ban on waste disposal, however, is less clear. Because newspapers typically are published with greater frequency than other publications, they generate more waste that requires disposal. Even with the property box limitations, then, lifting the ban would increase waste disposal to some extent. Although Koger contends that few inmates would order newspaper subscriptions, this is speculative. On this point, the Court defers to the professional judgment of the prison administrators.

The impact of lifting the ban on inmate violence—by providing a source of information about the nature of other inmates' charges or outside gang activity—is also

unclear. It is true that inmates can already learn about charges pending against of other inmates and local gang activity from television, letters, and visitors. But newspapers would provide an additional—and arguably more comprehensive—source of this information. The Court thus defers to the professional judgment of the prison administrators on this point as well.

As to these two rationales, then, the third *Turner* factor weighs in favor of the prison administrators. Accordingly, the Court must determine whether, under the fourth *Turner* factor, Koger's proposed alternatives to the newspaper ban would accommodate his rights at *de minimis* cost to jail security.

Koger identifies four alternatives to an absolute ban on newspapers. Specifically, he says that the jail could limit the number of newspapers permitted in each inmate's cell; prohibit local newspapers, which are more likely to contain information about other inmates and local gang activity; require newspapers to be sent directly from the publisher; or permit newspapers only in the jail's libraries and dayrooms.

Defendants have essentially refused to address these alternatives.[2] They argue only that they are not supported by evidence and repeat the assertion that "the unique risk posed by newspapers highlights the lack of alternative approaches." Defs.' Reply in Supp. of Def.'s Mot. for Summ. J. at 21. The Court is disinclined to do defendants' work for them. That said, some of these alternatives would not fully address the concerns raised by the jail. A limit on the number of newspapers permitted in each inmate's cell, for instance, would not completely address the claim of instigation of inmate violence,

---

[2] Notably, defendants have not argued that any of Koger's proposed alternatives would unduly burden jail resources.

because some (though fewer) newspapers identifying inmates' charges or describing local gang activity would still get through. And there would be some material (though less) that theoretically could be used to make weapons—though this is not really a viable security concern, as described earlier, given the absence of limitations on other paper-based materials. Prohibiting local newspapers would address the jail's concern about inciting violence by reports about inmates' pending charges or describing local gang activity. It would not necessarily resolve the waste disposal burden, however, though it is fair to infer that a prohibition on local newspapers would lower the overall number of newspapers received at the jail.

The last of these alternatives proposed by Koger—permitting newspapers in libraries and day rooms, but not individual cells—would accommodate the right while completely addressing the jail's concerns.[3] Restricting newspapers to these rooms would limit the amount of additional material entering the jail, thus addressing defendants' waste disposal concerns. It would also enable the jail to control information that is likely to cause violence. The jail could decide to purchase only national or international newspapers, which would be far less likely to contain information about the jail's inmates and local gang activity. The jail could also review each incoming issue for objectionable content. Because the jail already reviews incoming mail for security risks, there is no basis to believe this would pose any more than a minimal added burden on prison administrative resources.

The existence of this obvious, easy alternative to a total ban suggests that

---

[3] The Court notes that, because the jail completely bans newspapers, the right at issue here is the right to read newspapers; no question is raised about a right to subscribe to newspapers or to read a broad variety of newspapers.

16

banning newspapers is an exaggerated and therefore unreasonable response to the jail's concerns. *See Turner*, 482 U.S. at 90. That is not to say that this alternative would pass constitutional muster; the First Amendment may require even greater access to newspapers. But the Court need not define the precise contours of a restriction that would be constitutional in order to invalidate the restriction that is currently in place. For present purposes, the availability of an alternative that would accommodate the right but would not adversely impact jail security provides evidence that the jail's absolute ban on newspapers is unreasonable and thus unconstitutional.

The newspaper policies of other penal institutions provide further evidence that the ban is an exaggerated response to concerns about institutional security.[4] *See* Pl.'s LR 56.1(a) Stmt., Ex. 15. At least three other Illinois counties permit access to newspapers. *See* DuPage Cty. Sheriff, Corrections & Jail: Mail & Letters, http://www.dupagesheriff.org/Corrections-Jail/90/ (last visited July 6, 2015) ("Books, magazines and newspapers must be NEW and sent directly from the publisher (i.e. Newsweek, Chicago Tribune) or a reputable and verified .com company."); Will Cty. Sheriff, Adult Detention Inmates & Facilities: Mail Regulations, http://www.willcosheriff.org/adult-detention/mail-regulations (last visited July 6, 2015) (stating that the jail bans "[l]ocal newspaper articles" and "[b]ooks / magazines not directly sent from a publisher"); Champaign Cty. Sheriff, Correctional Center Inmate

---

[4] Defendants argue that the information from these websites is hearsay. But "a court 'shall' take judicial notice of a fact that is 'not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (quoting Fed. R. Evid. 201(b)). This includes information contained on government websites. *Id.* at 926-27 (collecting cases, holding that the district court abused its discretion by withdrawing judicial notice of information contained on federal government website, and taking judicial notice of this information).

17

Mail Information, http://www1.co.champaign.il.us/SHERIFF/InmateMail.php (last visited July 6, 2015) (stating that the jail bans "[l]ocal newspaper articles" and "[b]ooks / magazines not directly sent from a publisher"). The Federal Bureau of Prisons and Illinois Department of Corrections also permit newspapers. The Federal Bureau of Prisons allows inmates to "subscribe to or to receive" newspapers "without prior approval" if they are sent directly from the publisher. 28 C.F.R. § 540.70; *id.* § 540.71. The Illinois Department of Corrections' policy is even more lenient: "[I]nmates can receive publications, including . . . newspapers . . . . Inmates can receive publications from a vendor, friend or family. There is no limit through the mail. Publications brought to the facility shall be limited to 5 per visit." Ill. Dep't of Corrs., Frequently Asked Questions, http://www.illinois.gov/idoc/aboutus/Pages/faq.aspx (last visited July 6, 2015).

The Court must "accord substantial deference to the professional judgment of prison administrators . . . ." *Overton*, 539 U.S. at 132. But though deference given to prison officials is substantial, it is not complete. *See Stanley v. Henson*, 337 F.3d 961, 966 (7th Cir. 2003). As this Court previously observed in another context, "[o]fficials do not have *carte blanche* to institute any policy they please under the justification of institutional security." *Thompson v. Cty. of Cook*, 412 F. Supp. 2d 881, 889 (N.D. Ill. 2005) (citing *Stanley*, 337 F.3d at 966). *Id.* Although the jail's newspaper ban is rationally connected to jail security, the remaining *Turner* factors weigh heavily against defendants. The policy is the most extreme response available to the jail; it completely extinguishes an inmate's ability to exercise his First Amendment right to read newspapers. And it is an exaggerated response to the jail's security concerns, as there

18

are obvious, easy alternatives to an outright ban that would accommodate the right, with *de minimis* impact on the jail. Indeed, state and federal prisons have already accommodated the same right at issue here (much more generously, the Court notes, than Koger's proposed alternative), and there is no basis to believe that these accommodations have jeopardized institutional security. On the present record, no reasonable jury could find that banning newspapers is "reasonably related to [the jail's] legitimate penological interest[]." *Turner*, 482 U.S. at 89. The Court is therefore "not persuaded that deference [to jail administrators] is proper." *Kincaid*, 670 F.2d at 744-45.

Defendants have failed to raise a genuine dispute of fact regarding whether the jail's newspaper ban is reasonably related to institutional security. The Court therefore concludes that the jail's policy banning newspapers is unconstitutional. Because the jail applied this policy to Koger by returning a newspaper that was mailed to him, he is entitled to summary judgment on his First Amendment claim.

The only forms of relief available to Koger in light of the mootness of his request for an injunction and the absence of a claim of actual damages are his request for a declaratory judgment and nominal damages. Because Koger is entitled to summary judgment, he is entitled to both of these forms of relief. The Court directs the parties to confer regarding an appropriate form of judgment and to submit a proposal or separate proposals to the Court by no later than July 13, 2015.

**Conclusion**

For the foregoing reasons, the Court partly grants and partly denies both motions for summary judgment [dkt. nos. 62, 70 & 93]. The Court will issue a declaratory

judgment in plaintiff's favor and will award plaintiff nominal damages in the amount of one dollar. The Court denies plaintiff's request for an injunction. The parties' proposed form(s) of judgment are to be submitted by July 13, 2015. The case is set for a status hearing on July 15, 2015 at 9:30 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 6, 2015